Kerry E. Connolly (KC5614)
The Law Office of Kerry E. Connolly, Esq.
One Battery Park Plaza, 32nd Floor
New York, NY 10004
(212) 372-7333 - telephone
(917) 591-4858 – facsimile
kconnolly@connollylaw.us.com
kerry.connolly@gmail.com

Attorney for Plaintiffs Tina Magnuson,
  Allen Kelman, Erica Zolberg, KZ
  Video Consultants, Inc., Jeffrey Pearl,
  Lyn Noland, Michael Grimes,
  Matthew Randazzo, Robert A. DelRusso,
  David A. Smith, Michael Appel,
  Diana M. Barton, Sylvia Davis, Garth Michael

10 CIV 6211



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TINA MAGNUSON, ALLEN KELMAN,  :
ERICA ZOLBERG, KZ VIDEO
CONSULTANTS, INC.,                         :
JEFFREY PEARL, LYN NOLAND,
MICHAEL GRIMES, MATTHEW         :
RANDAZZO, ROBERT A. DELRUSSO,
DAVID A. SMITH, MICHAEL APPEL,   :
DIANA M. BARTON, SYLVIA DAVIS,
GARTH MICHAEL AND BRYAN           :
LESKOWICZ *for themselves and on
  behalf of those similarly situated,*        :
                          Plaintiffs,
                                                              :

          -against-
                                                              :

ALLEN NEWMAN, MATTHEW          :
WEINER, GREGORY MARQUETTE,
STAGE PRESENCE INCORPORATED,  :
"ABC CORP." D/B/A CHUNG KING
FILMED ENTERTAINMENT and         :
ONE FROM EACH ISLAND, LTD.,
                          Defendants.
-------------------------------------------------------x

**COMPLAINT**

FLSA COLLECTIVE AND
STATE LAW CLASS
ACTION

*Jury Trial Demanded*

Plaintiffs Tina Magnuson, Allen Kelman, Erica Zolberg, KZ Video Consultants, Inc., Jeffrey Pearl, Lyn Noland, Michael Grimes, Matthew Randazzo, Robert A. DelRusso, David A. Smith, Michael Appel, Diana M. Barton, Sylvia Davis, Garth Michael and Bryan Leskowicz individually, and on behalf of all others similarly situated, as class and collective representatives, upon personal knowledge and on information and belief as to matters relating to others, as and for their Complaint, through the undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1.      This lawsuit seeks to recover minimum wages, overtime and spread-of-hours compensation for Plaintiffs and their similarly situated co-workers, including line producers, production supervisors, sound mixers, production assistants and other workers who worked on the television production titled "Childhelp Salutes Congress".  The defendants are their employers, specifically, the Executive Producers of the production, defendants Allen Newman, Matthew Weiner, Gregory Marquette and the entities through which they ran their production activities, defendants Stage Presence Incorporated, "ABC Corp." d/b/a Chung King Filmed Entertainment and One From Each Island, Ltd.

2.      Plaintiffs bring this action for themselves and on behalf of similarly situated former employees of defendants who elect to opt-in to this action pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and specifically, the collective action provision of 29 U.S.C. § 216(b) to remedy violations of the wage-and-

hour provisions of the FLSA by defendants that have deprived Plaintiffs and others similarly situated of their lawfully earned wages.

3.     Plaintiffs also bring this action for themselves and on behalf of similarly situated current and former employees of defendants pursuant to Federal Rule of Civil Procedure 23 to remedy violations of the New York Labor Law ("NYLL") Article 6, §§ 190 *et seq.*, and Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor regulations.

4.     Additional claims within the supplemental jurisdiction of this Court are asserted by Plaintiffs for breach of contract and fraud and plaintiff KZ Video Consultants, Inc. for two returned checks, under applicable common law.

<u>JURISDICTION AND VENUE</u>

5.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 because this case arises under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). The Court has supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is appropriate pursuant to 28 U.S.C. § 1391 in that defendants transact business within this district.

7.     This Court has personal jurisdiction over the defendants, pursuant to New York Civil Practice Law and Rules §§ 301, 302 in that, *inter alia,* defendants reside, transact business and/or own property within this State, employed Plaintiffs within the State of New York and otherwise engaged in conduct that allows for the exercise of jurisdiction as permitted by the Constitution of the United States and the

laws of the State of New York, and accordingly may be served with process pursuant to Rule 4(h)(1), Fed. R. Civ. P.

## THE PARTIES

<u>Defendants</u>

8.    Defendant Allen Newman ("Newman") is an individual who, on information and belief, permanently resides and is domiciled on the Caribbean island of Anguilla, a British Overseas Territory.

9.    Defendant Stage Presence Incorporated ("Stage Presence") is a corporation organized and existing under the laws of the State of New York with its agent for service of process, according to the records of the New York Secretary of State, located in New York, New York.   Newman is the principal of Stage Presence and, on information and belief, its sole shareholder.

10.    Defendant Matthew Weiner ("Weiner") is an individual who works in the production side of the entertainment industry and is a long-time associate of Newman.

11.    Defendant "ABC Corp." is a fictitious name of the unknown named entity through which Weiner is conducting business as "Chung King Filmed Entertainment".

12.    Defendant Gregory Marquette ("Marquette") is an individual who resides, on information and belief, in Los Angeles, California.

13.    Defendant One From Each Island, Ltd. is an entity in which Newman, Weiner and Marquette claim to be partners and which was involved in the

production of "Childhelp Salutes Congress."

14.     As described in more detail below, Newman, Weiner and Marquette were collectively the Executive Producers of the televised concert "Childhelp Salutes Congress."

15.     Stage Presence and the Executive Producers' joint venture were engaged in commerce and the production of goods for commerce, its employees handled and worked on materials moved in commerce and their annual gross volume of business done is not less than $500,000.

Plaintiffs

16.     Plaintiff Tina Magnuson ("Magnuson") has been an entertainment industry producer for approximately 16 years.

17.     Magnuson was employed by the Executive Producers as a line producer within the last three years.

18.     Magnuson is a covered employee within the meaning of the FLSA and the NYLL.

19.     Plaintiff Allen Kelman ("Kelman") has been an entertainment business Producer for over 30 years, producing numerous live and taped music, entertainment, and award television shows.

20.     Kelman was employed by the Executive Producers as a Producer within the last three years.

21.     Kelman is a covered employee within the meaning of the FLSA and the NYLL.

22.   Plaintiff Erica Zolberg ("Zolberg") is an Emmy Award winning television producer and previously was, for many years, a producer of the CBS television network show "Weekend News".

23.   Zolberg was employed by the Executive Producers as a Producer within the last three years.

24.   Zolberg is a covered employee within the meaning of the FLSA and the NYLL.

25.   Plaintiff KZ Video Consultants, Inc. ("KZ Video") was employed by the Executive Producers to provide production services within the last three years.

26.   KZ Video is a covered employee within the meaning of the FLSA and the NYLL.

27.   Plaintiff Jeffrey Pearl ("Pearl") was employed by the Executive Producers as a floor producer within the last three years.

28.   Pearl is a covered employee within the meaning of the FLSA and the NYLL.

29.   Plaintiff Lyn Noland ("Noland") was employed by the Executive Producers as a Camera Operator within the last three years.

30.   Noland is a covered employee within the meaning of the FLSA and the NYLL.

31.   Plaintiff Michael Grimes ("Grimes") was employed by the Executive Producers as a Gaffer within the last three years.

32.    Grimes is a covered employee within the meaning of the FLSA and the NYLL.

33.    Plaintiff Matthew Randazzo ("Randazzo") was employed by the Executive Producers as a Video Engineer within the last three years.

34.    Randazzo is a covered employee within the meaning of the FLSA and the NYLL.

35.    Plaintiff Robert A. DelRusso ("DelRusso") was employed by the Executive Producers as a Camera Operator within the last three years.

36.    DelRusso is a covered employee within the meaning of the FLSA and the NYLL.

37.    Plaintiff David A. Smith ("Smith") was employed by the Executive Producers as a Camera Operator within the last three years.

38.    Smith is a covered employee within the meaning of the FLSA and the NYLL.

39.    Plaintiff Michael Appel ("Appel") was employed by the Executive Producers as a Board Operator within the last three years.

40.    Appel is a covered employee within the meaning of the FLSA and the NYLL.

41.    Plaintiff Diana M. Barton ("Barton") was employed by the Executive Producers as a Production Supervisor within the last three years.

42.    Barton is a covered employee within the meaning of the FLSA and the NYLL.

43.   Plaintiff Sylvia Davis ("Davis") was employed by the Executive Producers as a Production Assistant within the last three years.

44.   Davis is a covered employee within the meaning of the FLSA and the NYLL.

45.   Plaintiff Garth Michael ("Michael") was employed by the Executive Producers as an assistant within the last three years.

46.   Michael is a covered employee within the meaning of the FLSA and the NYLL.

47.   Bryan Leskowicz was employed by the Executive Producers as a Producer within the last three years.

48.   Leskowicz is a covered employee within the meaning of the FLSA and the NYLL.

**Background**

49.   Any television show, concert or other large, staged event requires the contribution of many people performing many different functions, *e.g.*, set design, lighting, sound, camera, talent management, directing, audience control, teleprompter, administration, financial administration and production accounting, *etc.*

50.   The mobilization of all the required employees and equipment, travel arrangements and housing, as well as all of the other tasks involved in any large-scale production requires a significant amount of effort, coordination and money, often in a short amount of time.

51.    It is the custom and practice in the entertainment industry for employees to accept employment on oral offers of employment and vendors to provide goods and services based on nothing more than a telephone call, email or a handshake, with appropriate documentation, whether it be time cards, invoices and contracts, entered into thereafter.

52.    Trust that the Executive Producers will pay wages and other debts incurred on the project is essential to assembling a production crew and contracting with vendors.

53.    That is why it is the cardinal rule in the entertainment business that the Executive Producers must ensure that the money for the project is in place before contracting with people to work and provide services on the project.  Giving the "go" on a production is universally understood to constitute a representation that the funding is in place.  If every member of a production crew had to individually certify the financing of the production company before taking a job, the entertainment industry would grind to a halt.

54.    Defendant Newman is the principal of defendant Stage Presence. He has been a Producer for over 25 years, most recently producing such shows as Revolver Magazine's "Golden Gods Awards" for VH-1, as well as directing "Video Game Live" for PBS.  When he acts as the Executive Producer on a project he is hired by a client, such as Black Entertainment Television ("BET"), to put together a show, a concert or some other type of entertainment event.  The Executive Producer does not fund the project, the client does.

55.    Approximately one year ago, Newman, with his wife and two children, moved to Anguilla.  Newman closed up his Manhattan office and rented out his co-operative apartment in Manhattan.  Today Newman conducts business via a virtual office and a cell phone with an Anguillan area code.

56.    At Newman's farewell dinner at Katz's Deli in New York City, Newman explained to the guests, including Kelman and Zolberg, that he had been associated with an Anguillan recording/record/music management business for some time.  Newman said that his move to Anguilla was an opportunity to develop new business and make the Anguillan venture profitable.

57.    Over the years, as Executive Producer, Newman has hired Kelman many times to be part of the production team on various projects.  As the Producer, it is Kelman's job to put together the entire show under the Executive Producer's supervision and administer the finances.  Among other duties, in the name of the Executive Producer, Kelman retains employees for the Executive Producer, enters into contracts with vendors, administers payroll, and pays expenses with the funds provided by the client to the Executive Producer.

58.    Through Kelman's many years of experience in the entertainment business, Kelman has developed a network of people and vendors who excel at their jobs and are ready to hit the ground running on any given project.  Kelman has worked with these people and vendors on many projects and they trust him and rely on their long experience of working with him that a project in which he is involved will be run in a professional manner and that they will be paid for their work and/or goods and

services they contribute.  Kelman's ability to assemble a well-oiled and proficient

production crew on any given job is critical to his success as a Producer and to his

future employment.  Kelman's reputation is his "currency" in the entertainment

industry.

59.    On many of the past projects Kelman has worked on with

Newman, the productions have hired many of the same people and used the same

vendors as were ultimately retained by Kelman for the Executive Producers on the

Childhelp project.  Like Kelman, many of the people and businesses in this network

have known Newman for years and have worked for him on many successful projects.

In the past, there has never been a project that Newman produced where he departed

from the industry norm of having the funding in place prior to commencing work on a

project, nor has there ever been a project Newman produced where the employees and

vendors have not been paid.

**The Childhelp Project**

60.    From January 12-14, 2010,  Kelman was doing pre-production

planning on the VH-1 "Golden Gods" production with Newman in Los Angeles.

Newman told Kelman that he, his long-time associate, Weiner, were joint venturing

with a third person, Marquette, to be the Executive Producers for a series of events

designed, in part, to showcase the musical artists Newman's Anguillan business was

managing.  Newman explained that Weiner had invested in Chung King Recording

Studios, a recording studio based in New York City used by artists such as Run-

D.M.C., The Beastie Boys, and LL Cool J, and was looking to expand its operations into

11

filmed entertainment.   Weiner had brought Marquette to the joint venture because Marquette had previously arranged funding on a similar project, and had supposedly brought the funding source to this new joint venture.

61.   Newman said that the first of the venture's planned events would be a concert in Washington, D.C.  in April 2010 to benefit a charity named Childhelp, followed by a second, larger concert in Barbados in May 2010 for the benefit of the children of Haiti, with other events to follow.  The Childhelp concert would feature pianist David Foster as Music Director and host who would introduce the other musical artists and celebrities, including Patti LaBelle and Jane Seymour.  The show would be broadcast on BET's cable channel.

62.   Newman told Kelman that the Executive Producers had entered into a contract with Marquette's contact providing for the funding of the productions. Newman asked Kelman if he would work on the project once the Executive Producers had received the funds.

63.   Kelman told Newman he was not available for the Barbados show due to a prior commitment, but agreed that he would work on the Washington, D.C. Childhelp show, once the Executive Producers had received the funds.

64.   Newman and Kelman agreed that Kelman would be paid a fee of $42,400 for his services and the more limited services of his producer wife, Erica Zolberg.

65.   Newman invited Kelman to bring his family to visit Newman, his wife and children in March 2010 at his home in Anguilla.  Kelman and Zolberg and their two sons visited the Newman family in Anguilla from March 20-28, 2010.

66.   Over the course of the eight days in Anguilla, Kelman and Zolberg discussed business with Newman several times.  Newman described various undertakings of the Anguillan business, including launching a hot sauce with the company's label on it, developing a marketing strategy with baskets including the sauce, other local island products and CDs of island music performed by artists he was managing.

67.   Regarding the joint venture, Newman repeated what he had earlier told Kelman, *i.e.*, that the Executive Producers had entered into a contract with a financial backer who was providing the funds for the Childhelp D.C. show and the Barbados show.  Newman stated that he intended to promote the artists he had under management at the D.C. and Barbados shows.  Newman said the Executive Producers were including in the D.C. show line-up one of the Anguillan musical artists he managed.  With less than three weeks left before the planned Childhelp concert, Newman assured Kelman that, based on the Executive Producers' contract with the funding source, the Executive Producers' receipt of the funds for the Childhelp show was imminent.

68.   When Kelman returned to the U.S. from Anguilla on March 28, 2010, because there was such a short lead time before the anticipated April 13, 2010, D.C. concert date, Kelman contacted the people with whom he frequently collaborated to put

13

a "hold" on their services.  That is, Kelman notified them that this project was in the works, and asked if they would be available for the days required to reserve them for the project should the funding come through.

69.    As the concert date approached, many of the "hold" employees and vendors asked Kelman if the project was definitely going to happen.  Kelman, in turn, several times telephoned Newman to ask if the contracted for funding had arrived yet. Newman kept assuring Kelman that "it looked good", that the funding was going to come through at any time.

70.    Finally, on or about March 29, 2010 , with only 15 days left before the concert,  Kelman telephoned Newman, who was in Anguilla, and asked him if the Executive Producers had received the funding for the Childhelp concert.

71.    Newman said to Kelman "it's good to go."  By that statement, Newman intended to convey and cause Kelman to believe that Newman had definitely secured the funding for the project.  Based on their long association and the custom and practice of the industry, Newman knew that by making that representation to Kelman, Kelman would rely on its truthfulness and would believe the Executive Producers had the funding in place.

72.    Newman knew for Kelman that having the funding for the project was the *sine qua non* to Kelman's involvement in the project for three reasons:  (1) Kelman had told him so during their discussions in Anguilla, (2) it is the custom and usage in the industry for the Executive Producers not commit to a project unless the funding is in place, and (3) consistent with that custom and usage, Kelman, as a

14

producer (not the executive producer), had no responsibility for or control over the financing, so he would not risk his compensation and reputation by participating in a project without sound financial backing arranged by the Executive Producers.

73.   Newman also knew that Kelman would rely on this representation in beginning work on the project, not only so that Kelman could be assured that he and the other employees and vendors would be paid, but also that it would be the type of high-caliber, capably managed project with which Kelman associates himself.

74.   Based on his long association with Newman, the custom and practice of the industry, and the fact that Newman made the statement, Kelman justifiably relied on Newman's representation that the Executive Producers had the funding.  Therefore, in order to get the project pulled together on such a short lead time, Kelman swung into action.  Although the Childhelp project was a joint venture of the three Executive Producers, they had not formed a production company or some other vehicle for their venture, so Newman instructed Kelman to hire the required employees, contract for goods and services and make travel arrangements in the name of Stage Presence.

75.   Kelman reported to Tina Magnuson and others that the Executive Producers had received the funding and the show was a "go."

76.   Magnuson was hired as the line producer with the responsibility to manage, among other things, travel arrangements, book hotels, payroll and coordinate with vendors.  Newman authorized Magnuson to use his Stage Presence American Express card to block hotel rooms and pay various charges.  Everyone who was hired,

including Plaintiffs and the Class Members, performed their jobs well, working diligently and quickly in order to put the project together in time.

77.   In the days leading up to the Childhelp show, Kelman reported on progress to Newman, who had arrived in Washington, D.C.  Newman approved the hiring of the employees and vendors, and the other arrangements that had been made. Newman provided Magnuson with petty cash for incidental expenses.

78.   Media Services, a payroll servicing company, was hired to do the payroll processing and send checks to the employees.  Media Services had been given account information on Stage Presence's checking account from which it was supposed to fund the payroll.

79.   In addition to Executive Producing with Weiner and Marquette, Newman was also going to direct the show personally.   Marquette was personally writing the script and Weiner attended some production meetings.  At no point did Newman, Weiner or Marquette report to Kelman, Magnuson, Zolberg or any other Plaintiff that they had not, in fact, received the funding.  To the contrary, their personal, active participation in the show affirmatively reinforced the universal understanding that "Childhelp Salutes Congress" had been fully funded.

80.   Thus, the Executive Producers did not correct Newman's false statement that the funds for the project had been received either before all the Plaintiffs and Class Members committed to work on the project or even when the Plaintiffs and Class Members travelled to Washington, D.C. to begin on-site work on the project, although the Executive Producers knew that Magnuson, Kelman, Zolberg, KZ Video

Consultants and the additional Plaintiffs and Class Members would justifiably rely first, on the Executive Producer's statement, and then, on their silence.

81.   Newman made those statements and omissions of material fact with the intent to induce the reliance of Magnuson, Kelman, Zolberg, KZ Video Consultants and the other Plaintiffs and Class Members thereon.

82.   Weiner and Marquette had a duty to disclose the fact that the Executive Producers had not received the funding and their failure to do so was an omission of a material fact.

83.   Weiner and Marquette omitted to disclose this material fact with the intent to induce the reliance of Magnuson, Kelman, KZ Video Consultants, the other Plaintiffs and Class Members that, like every other show they had worked on with Newman, they would be paid for their work, labor and services.

84.   Magnuson, Kelman, Zolberg, KZ Video Consultants, the other Plaintiffs and Class Members justifiably relied on Newman's statements and omissions of material fact.

85.   Magnuson, Kelman, KZ Video Consultants, the other Plaintiffs and Class Members justifiably relied on Weiner's and Marquette's omissions of material fact.

### The Show Goes On

86.   Improbable though it was, given the short lead time and the amount of work that was required, the production went without a hitch; the Childhelp concert

took place on April 13, 2010 and was filmed, as planned, for television, and broadcast on BET.

87.    Newman gave Kelman 19 checks, drawn on Stage Presence's account and signed by him, made out to some of the employees who had not been included on the payroll,  and to the vendors to deliver to the payees after the concert and all paperwork was submitted and the services were rendered, totaling the sum of $128,326.14.

88.    Because of the massive effort the short lead time had required of Kelman, Kelman negotiated with Newman an additional $10,000 to his fee.  In addition to the 19 checks referenced above, Newman gave Kelman two more checks drawn on Stage Presence's account which Newman had signed:  one check for $42,000 and another for $10,000 in payment of Kelman's and Zolberg's fee payable to KZ Video Consultants.

89.    Shortly afterwards, Newman returned to Anguilla.

**The Fraud Comes to Light**

90.    In the days following the show, Magnuson collected employee time cards and vendor invoices.  Once she had all the employee paperwork, Magnuson submitted the payroll (time cards, I-9s, W-4s, *etc.*) to Media Services, the payroll company.  On or about May 5, 2010, Tom Burkholder of Media Services, emailed  and notified her that there were insufficient funds in Stage Presence's account to fund the payroll.  Media Services resigned, and returned a copy of the payroll documents.

91.   As soon as Magnuson reported to Kelman that the payroll was not funded, Kelman telephoned Newman, who was by then back in Anguilla.  Confronted with the unfunded payroll, Newman confessed that the Executive Producers had not yet, in fact, received the funding.

92.   Kelman was shocked at this departure from the industry practice. He was also amazed and angry that Newman – his long-time colleague -- had lied to him about such an important matter.  Kelman, the crew and the vendors, in reliance on Newman's representation that the Executive Producers had the funding, had pushed themselves, working stressful, very long days in order to pull off a monumental feat in very short order, only to find out that a long-time business collaborator had obtained their services under false pretenses.

93.   Kelman's ability to achieve such participation and effort is part of what he considers his "currency" in the entertainment business which was unfairly manipulated by the Executive Producers.  Having been thus used on a project where the Executive Producers lied to their employees and vendors and have failed to pay them has caused Kelman's "currency" to be devalued.

94.   Kelman and the other Plaintiffs would not have agreed to do the project if Newman had told the truth. Newman knew that Kelman and the other Plaintiffs would not have agreed to work on the project if he had told the truth.

95.   During the May 5, 2010 telephone call, when Kelman telephoned Newman, Newman tried to downplay the seriousness of the situation; Newman

assured Kelman that it was a temporary problem, and that the funding remained imminent and everyone would get paid in short order.

96.     But now, months later, that has not happened.  Continuing their pre-production misdeeds, from the May 5, 2010 telephone call to Anguilla forward, the Executive Producers have systematically lied to Plaintiffs, and other employees and vendors.  The Executive Producers have claimed at various times, that the funding would be in place "within the week", and when that did not happen, they said it would be the next week, and so on.

97.     Since the May 5, 2010 telephone call, Kelman has had several telephone calls with Newman, who was ensconced in Anguilla.  Kelman heard the same thing over and over from Newman – the funds would be received imminently.

98.     Based on Newman's claim that the funds were coming within the week, Kelman deposited the  two checks to KZ Video Consultants representing his fee and Erica Zolberg's fee.  Those checks were returned unpaid by Newman's bank with the notation "Frozen Blocked Account."  A copy of the two returned checks are attached hereto as Exhibit 1.

99.     As noted earlier, the payroll checks were never even issued by because the bank account had insufficient funds for the necessary sweep.  Kelman also still has the 19 manually signed checks issued by Newman on the Stage Presence account, payable to others involved in the production, but he declined to transmit them once he learned of the fraud, not wanting to assist in furthering it.

100.  Many of the employees and vendors began questioning the Executive Producers directly about when they would receive the money owed to them. In response, in what appears to be an attempt to fob off the responsibility, and deter legal action for their fraud, on July 9, 2010, the Executive Producers wrote a joint letter addressed to "Childhelp Crew, Staff & Vendors", claiming that a Trustee of "Geneve International Trust" had "secured a loan" to pay for all of the obligations from the Childhelp show.  Oddly, the Executive Producers suggested that the crew, staff and vendors contact the Trustee -- with whom the crew, staff and vendors had no contractual or employee/employer relationship -- directly in order to obtain information about the "arrival of funds."  A copy of the July 9, 2010 letter from Allen Newman, Matthew Weiner and Gregory Marquette is attached hereto as Exhibit 2.

101.  Within a week of that letter, the "secured a loan" story to pay the obligations of the Childhelp show story changed.   On July 15, 2010, the Executive Producers circulated a letter of the same date to the crew and vendors, from the purported trustee of "Geneve International Trust" addressed to Childhelp, in which the "trustee" makes no reference to having secured a loan.  Rather, the "trustee" claims that:

> We have been working diligently to obtain funds from our sources and expect to close the first transaction by the end of next week.  The funds will be wired to your account as soon as they are received.

A copy of that letter is attached hereto as Exhibit 3.

102.  Despite all the representations and reassurances, to date, the Executive Producers have not paid any of the employees and vendors.

### The Corporate Veil Should be Pierced and Newman, Weiner and Marquette Held Jointly and Severally Liable

103.   The Executive Producers, as joint venturers, are the employers of Plaintiffs and the Class Members, and are jointly and severally liable for unpaid wages under the FLSA and NYLL.

104.   Likewise, the entities through which the joint venturers acted in conjunction with the Childhelp project, *i.e.,* Stage Presence, ABC Corp. d/b/a Chung King Filmed Entertainment, and One From Each Island, Ltd. are the employers of Plaintiffs and the Class Members and are jointly and severally liable for unpaid wages under the FLSA and NYLL.

105.   It was a misuse of the corporate form to conduct the business of the joint venture through Stage Presence and the corporate veil should pierced to hold Newman, Weiner and Marquette jointly and severally liable on the claims in this action.

106.    Newman, Weiner and Marquette variously used different corporate entities and d/b/as during the course of the Childhelp production, thus playing a shell game with their employees and creditors.  Although all the facts are not yet known, it is at least clear that Stage Presence was not the entity which contracted with BET to produce the Childhelp show.   At times when communicating with their employees and creditors, Newman, Weiner and Marquette signed letters as "Partners, One from Each Island, Ltd.", with the logos of One From Each Island, Chung King Filmed Entertainment and Stage Presence on top of the page, as in their letter dated May 24, 2010 "To the Crew, Vendors, Creditors and To Whom Else It May Concern", a copy of

which is attached hereto as Exhibit 4.   At other times, reference is made to "the

partnership that worked on the show" (email from Allen Newman to Gigi Shapiro

dated June 10, 2010, a copy of which is attached hereto as Exhibit 5).

107.   Moreover, Stage Presence is a shell corporation and is Newman's

alter ego.

108.   Stage Presence does not have a fixed place of business; Newman

operates it out of a virtual office.

109.   Stage Presence is completely dominated and controlled by Newman;

upon information and belief, it has no other officers, employees or shareholders.

110.   Newman uses Stage Presence as his personal piggy-bank, depositing

and removing funds at his convenience, without regard to the debts it owes to creditors.

111.   Stage Presence is undercapitalized and admittedly has insufficient

funds to pay the debts it owes to creditors (*see* Letter from Allen Newman to Dave

Shack dated June 24, 2010, a copy of which is attached hereto as Exhibit 6), and as

demonstrated by the two bad Stage Presence checks Newman issued to Kelman.

112.   In addition to the two bad checks he issued to Kelman, Newman , in

violation of N.Y. Penal Law § 190.05,  issued 19 checks on Stage Presence's account to

pay for work, labor and services on the Childhelp show, totaling $128,326.14.   A copy of

each of those checks is attached hereto as Exhibit 7.  Newman knew, at the time he

wrote those checks, that there were insufficient funds in Stage Presence's account to

cover them.

113.   Stage Presence fails to observe the corporate formalities, and does not even update the required corporate filings with the New York Secretary of State, which lists Newman as Stage Presence's registered agent for service of process at an address where Newman has not lived or done business for at least 10 years.  A copy of Stage Presence's filing with the New York Secretary of State is attached hereto as Exhibit 8.

114.   Newman has used the Stage Presence form to conduct the business of the unrelated Anguillan music recording/management business.

115.   Newman and his co-venturers used the corporate form of Stage Presence to employ Plaintiffs and the Class Members, other employees and vendors although it did not have the funding to pay for the work, labor and services it contracted for, and thus used the corporate form of Stage Presence to perpetrate the large-scale fraud on Plaintiffs and the Class Members, as well as other creditors.

116.   These actions perpetrate a fraud or injustice through misuse of the corporate form because they unfairly allow the Executive Producers to avoid paying Plaintiffs and the Class Members if they are awarded a judgment against Stage Presence.

<u>FLSA COLLECTIVE ACTION ALLEGATIONS</u>

117.   The First and Second Claims for Relief are properly brought by Plaintiffs pursuant to FLSA § 16(b), 29 U.S.C. § 216(b), for themselves and on behalf of all persons employed by the Executive Producers who elect to opt-in to this action (the "FSLA Collective Plaintiffs").

24

118.   This action claims that defendants violated the wage-and-hour provisions of the FLSA by depriving Plaintiffs, as well as others similarly situated to the named Plaintiffs, of their lawful wages.   Upon information and belief, there are many similarly situated employees of the Executive Producers who have not been paid, in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join this lawsuit.

119.   The FLSA Collective Plaintiffs are readily ascertainable.  For purpose of notice and other purposes related to this action, their names and addresses are readily available.  Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to defendants pursuant to 29 U.S.C. § 216(b) and via electronic mail.

120.   Plaintiffs and all similarly situated employees who elect to participate in this action seek unpaid compensation, an equal amount of liquidated damages and/or prejudgment interest, attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

## RULE 23 CLASS ALLEGATIONS – NEW YORK

121.   Plaintiffs bring the Third through Fifth Claims for Relief, pursuant to Fed. R. Civ. P. 23, for themselves and on behalf of all of the employees of the Executive Producers for the period February 1, 2010 through July 31, 2010 (the "Class Period").

122.   The Rule 23 Class Members are readily ascertainable.  The number and identity of the Rule 23 Class Members are determinable from the records of the Executive Producers.  The hours assigned and worked, the positions held, and the rates

of pay for each Rule 23 Class Member are also determinable from the Executive

Producers' records.  For purposes of notice and other purposes related to this action,

their names and addresses are readily available.  Notice can be provided by means

permissible under Fed. R. Civ. P. 23.

123.  Excluded from the Rule 23 Class Members are defendants,

defendants' legal representatives, officers, directors, assigns, and successors, or any

individual who has, or who at any time during the class period has had, a controlling

interest in defendants; the Judge(s) to whom this case is assigned and any member of

the Judges' immediate family, and all persons who will submit timely and otherwise

proper requests for exclusion from the Rule 23 Class.

124.  The proposed Class is so numerous that joinder of all members is

impracticable, and the disposition of their claims as a class will benefit the parties and

the court.  Although the precise number of such persons is unknown, and the facts on

which the calculation of that number are within the sole control of defendants, upon

information and belief, there are more than fifty (50) members of the Class.

125.  Plaintiffs' claims are typical of those claims which could be alleged

by any member of the Class, and the relief sought is typical of the relief which would be

sought by each member of the Class in separate actions.  All the Rule 23 Class Members

were subject to the same corporate practices of defendants, as alleged herein, of failing

to pay minimum wage, spread of hours pay and overtime compensation.  The

Executive Producers affected all Rule 23 Class Members similarly, and they benefitted

from the same type of unfair and/or wrongful acts as to each Class member.  Plaintiffs

and other Rule 23 Class Members sustained similar losses, injuries and damages arising

from the same unlawful policies, practices and procedures.

126.   Plaintiffs are able to fairly and adequately protect the interest of the

Class and have no interests antagonistic to the Class.  Plaintiffs are represented by

attorneys who are experienced and competent in both class action litigation and

employment litigation.

127.   A class action is superior to other available methods for the fair and

efficient adjudication of the controversy – particularly in the context of wage and hour

litigation where individual Rule 23 Class Members lack the financial resources to

vigorously prosecute a lawsuit against corporate defendants.  Class action treatment

will permit a large number of similarly situated persons to prosecute their common

claims in a single forum simultaneously, efficiently, and without the unnecessary

duplication of efforts and expenses that numerous individual actions engender.

Because the losses, injuries and damages suffered by each of the individual Rule 23

Class Members are small in the sense pertinent to a class action analysis, the expenses

and burden of individual litigation would make it extremely difficult or impossible for

the individual Rule 23 Class Members to redress the wrongs done to them.  On the

other hand, important public interests will be served by addressing the matter as a class

action.  The adjudication of individual litigation claims would result in a great

expenditure of Court and public resources; however, treating the claims as a class action

would result in a significant saving of these costs.  The prosecution of separate actions

by individual members of the Class would create a risk of inconsistent and/or varying

adjudications with respect to the individual members of the Class, establishing

incompatible standards of conduct for defendants and resulting in the impairment of

Rule 23 Class Members' rights and the disposition of their interests through actions to

which they were not parties. The issues in this action can be decided by means of

common, class-wide proof. In addition, if appropriate, the Court can, and is

empowered to fashion methods to efficiently manage this action as a class action.

128. Upon information and belief, defendants and other employers

throughout the state violate the New York Labor Law. Current employees are often

afraid to assert their rights out of fear of direct or indirect retaliation. Former

employees are fearful of bringing claims because doing so can harm their employment,

future employment and future efforts to secure employment. Class actions provide

Rule 23 Class Members who are not named in the complaint a degree of anonymity

which allows for the vindication of their rights while eliminating or reducing these

risks.

129. There are questions of law and fact common to the Class which

predominate over any questions affecting only individual Rule 23 Class Members,

including:

a) Whether defendants violated NYLL Article 6, §§ *et seq.*, and
   Article 19, §§ 650 *et seq.*, and the supporting New York State
   Department of Labor regulations, 12 N.Y.C.R. R. Part 137, as
   alleged herein;

b) Whether defendants failed to pay Plaintiffs and the Rule 23
   Class the minimum wage for all hours worked;

c)  Whether defendants compensated Plaintiffs and the Rule 23
Class for hours worked in excess of 40 per workweek;

d)  Whether d efendants failed to provide Plaintiffs and the Rule 23
Class spread-of-hours compensation when they worked in
excess of 10 hours a day, as required by the NYLL;

e)  Whether defendants' failure to pay workers was instituted
willfully or with reckless disregard of the law;

f)  What are and were the policies, practices, programs,
procedures, protocols and plans of defendants regarding the
types of work and labor for which defendants did not pay the
Rule 23 Class Members at all;

g)  At what common rate, or rates subject to common methods of
calculation, were and are defendants required to pay the Rule
23 Class Members for their work; and

h)  The nature and extent of class wide injury and the measure of
damages for those injuries.

130.  This action is properly maintainable as a class action under Federal

Rule of Civil Procedure 23(b)(3).

<u>FACTS COMMON TO ALL FLSA AND NYLL CLAIMS</u>

131.  Plaintiffs' consent to sue forms are attached hereto as Exhibit 9.

132.  Defendants, individually and collectively, constitute enterprises

engaged in commerce or in the production of goods for commerce, with an annual

volume of business done of not less than $ 500,000.

133.  The Plaintiffs, the FSLA Collective Plaintiffs and the Rule 23 Class

Members (collectively, the "Class Members"), have been victims of defendants'

common policy and plan that has violated their rights under the FLSA and the NYLL by

denying them a proper minimum wage, overtime compensation, and other wages. At all relevant times, defendants' unlawful policy and pattern or practice has been willful.

134.   The Executive Producers have intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA and the NYLL, as follows:

135.   The Executive Producers failed to pay Plaintiffs and the Class Members *any* of their wages.

136.   Defendants failed to pay Plaintiffs and the Class Members time and a half for all hours worked over forty in a workweek, in violation of the FLSA and the NYLL.

137.   Defendants failed to pay Plaintiffs and the Class Members spread-of-hours compensation that they earned when they worked days of 10 hours or more.

138.   The Executive Producers' unlawful conduct has been intentional, willful and in bad faith and has caused significant damages to Plaintiffs and the Class Members.

139.   Defendants committed these acts knowingly, intentionally and willfully.

140.   Defendants knew that nonpayment of minimum wage, nonpayment of overtime, and non-payment of spread-of-hours pay would economically injure Plaintiffs and violated federal and New York State law.

141.   Defendants committed the foregoing acts against the Plaintiffs, the FLSA Collective Plaintiffs and the members of the Class.

PLAINTIFFS' FACTUAL ALLEGATIONS

142.   The rate of pay, the number of overtime hours, total straight time owed, the total overtime owed and total amount owed to the Plaintiffs who were put on payroll is set forth on the spreadsheet attached hereto as Exhibit 10.

Allen Kelman

143.   Defendants did not pay the proper minimum wage or overtime wage for all of the time that Kelman worked each workweek.

144.   Defendants did not pay Kelman spread-of-hours pay for shifts he worked of 10 hours or more per day.

145.   Defendants owe Kelman $50,000 in unpaid wages.

Erica Zolberg

146.   Defendants did not pay Zolberg any wage, let alone the proper minimum wage or overtime wage for all of the time that she worked each workweek.

147.   Defendants did not pay Zolberg any wage, let alone the spread-of-hours pay for shifts she worked of 10 hours or more per day.

148.   Defendants owe Zolberg unpaid wages in the sum of $2400.

KZ Video Consultants

149.   Alternatively, as the entity through which Kelman and Zolberg are paid their wages, KZ Video was not paid by Defendants any wage, let alone the proper minimum wage or overtime wage for all of the time that Kelman and Zolberg worked each workweek.

150.   Defendants did not pay KZ Video spread-of-hours pay for shifts Kelman and Zolberg worked of 10 hours or more per day.

**FIRST CLAIM FOR RELIEF**
**(FLSA Minimum Wage Violations, 29 U.S.C. §§ 201 *et seq.***
**Brought by Plaintiffs for Themselves and on Behalf**
**Of the FLSA Collective Plaintiffs)**

151.   Plaintiffs, for themselves and on behalf of other FLSA Collective Plaintiffs, repeat, reallege and incorporate by reference all allegations in all preceding paragraphs.

152.   At all relevant times, defendants have engaged in a widespread pattern, policy and practice of willfully violating the FLSA.

153.   At all relevant times, defendants willfully, regularly and repeatedly failed to pay Plaintiffs and the FLSA Collective Plaintiffs the minimum wages to which they are entitled under the FLSA.

154.   As a result of Defendants' violations of the FLSA, Plaintiffs and the FLSA Collective Plaintiffs have suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to the recovery of those amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

155.   Defendants' unlawful conduct, as described in this Complaint, has been willful and intentional.  Defendants were aware or should have been aware that the practices described in this Complaint were unlawful.  Defendants have not made a

good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and the FLSA Collective Plaintiffs.

### SECOND CLAIM FOR RELIEF
**(FLSA Overtime Wage Violations, 29 U.S.C. §§ 201 et seq.**
**Brought by Plaintiffs for Themselves and on Behalf**
**Of the FLSA Collective Plaintiffs)**

156.   Plaintiffs, for themselves and on behalf of other FLSA Collective Plaintiffs, repeat, reallege and incorporate by reference all allegations in all preceding paragraphs.

157.   The overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to defendants and protect Plaintiffs and the FLSA Collective Plaintiffs.

158.   Defendants willfully failed and refused to pay the Plaintiffs and other FLSA Collective Plaintiffs for all hours worked, including one and one half times the minimum wage for work in excess of forty (40) hours per workweek.

159.   As a result of defendants' unlawful acts, Plaintiffs and the FLSA Collective Plaintiffs have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to the FLSA.

### THIRD CLAIM FOR RELIEF
**(New York Minimum Wage Act, N.Y. Stat. § 650 *et seq.*,
brought by Plaintiffs for Themselves and
on Behalf of the Class)**

160.   Plaintiffs, for themselves, and on behalf of the Class Members, repeat reallege and incorporate by reference all allegations in all preceding paragraphs.

161.   Throughout the Class Period, defendants willfully, regularly and repeatedly failed to pay Plaintiffs and the Class for all hours worked.

162.   Defendants' failure to pay Plaintiff and the Class Members the minimum wage was willful within the meaning of NYLL § 663.

163.   As a direct and proximate result of defendants' willful and unlawful conduct, as set forth herein, Plaintiffs and the Class Members have sustained damages, including loss of earnings, in an amount to be established at trial, liquidated damages, prejudgment interest, and costs, and attorneys' fees, pursuant to N.Y. Lab. Law § 663.

### FOURTH CLAIM FOR RELIEF
**(New York Minimum Wage Act, N.Y. Stat. § 650 et seq.,
Brought by Plaintiffs for Themselves and
on Behalf of the Class)**

164.   Plaintiffs, for themselves and on behalf of the Class Members, repeat, realleges and incorporate by reference all previous paragraphs.

165.   It is unlawful under New York law for an employer to suffer or permit a non-exempt employee to work without paying overtime wages for all hours worked in excess of forty (40) hours in any workweek.

166.  Defendants willfully failed to pay Plaintiffs and the Class Members the required overtime compensation, one and a half times the minimum wages for hours worked in excess of forty (40) hours per workweek.

167.  As a direct and proximate result of defendants' unlawful conduct, as set forth herein, Plaintiffs and the Class Members have sustained damages, including loss of earnings, in an amount to be established at trial, liquidated damages, prejudgment interest, and costs and attorneys' fees, pursuant to N.Y. Lab. § 663.

### FIFTH CLAIM FOR RELIEF
**(N.Y. Lab. L. § 650 *et seq.* and N.Y. Comp. Code
R. & Regs. Tit. 12, § 137-1.7 Spread of Hours Pay
Brought by Plaintiffs for Themselves
and on Behalf of the Class)**

168.  Plaintiffs, for themselves and the Class Members, repeat, reallege and incorporate by reference all allegations in all preceding paragraphs.

169.  Defendants have willfully failed to pay Plaintiffs and the Class Members additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

170.  By Defendants' failure to pay Plaintiffs and the Class Members spread-of-hours pay, defendants have willfully violated NYLL Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations.

171.  As a result of defendants' unlawful conduct, Plaintiffs and the Class Members have sustained damages, including loss of earnings, in an amount to be proven at trial, and are entitled to liquidated damages, prejudgment  interest, and costs and attorneys' fees, pursuant to NYLL § 663.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract --
### Brought by Plaintiffs for Themselves
### and on Behalf of the Class)

172.   Plaintiffs for themselves and the Class Members, repeat, reallege and incorporate by reference all allegations in all preceding paragraphs.

173.   Plaintiffs and the Class Members were offered employment by the Executive Producers at an individually agreed rate of pay and Plaintiffs and the Class Members accepted the Executive Producers' offers of employment.

174.   Notwithstanding their agreement to do so, the Executive Producers have failed to pay Plaintiffs and the FLSA Collective Plaintiffs and the Class Members the agreed upon sums.

175.   Plaintiffs and the Class Members have been damaged in the amount of the agreed upon sums, which remain unpaid.

176.    As a result of the foregoing, the Executive Producers are guilty of breach of contract.

177.   The Plaintiffs and the Class Members are accordingly entitled to damages in the sum of their agreed-upon compensation, together with interest thereon at 9% from the date of the breach.

## SEVENTH CLAIM FOR RELIEF
### (Declaratory Judgment --
**Brought by Plaintiffs for Themselves and on Behalf
of the FLSA Collective Plaintiffs and Class Members)**

178.   Plaintiffs, for themselves and on behalf of the FLSA Collective Plaintiffs and Class Members, repeat, reallege and incorporate by reference the prior allegations of this complaint as if fully alleged herein.

179.   This action provides a ripe and justiciable case or controversy.

180.   It is just and equitable that the Court declare the rights and other legal relationships of the parties.

181.   Plaintiffs, the FLSA Collective Plaintiffs and the Class Members are entitled a declaration that defendants' acts are in violation of the FLSA and the NYLL.

## EIGHTH CLAIM FOR RELIEF
### (Fraud --
**Brought by Plaintiffs for Themselves and on Behalf
of the FLSA Collective Plaintiffs and Class Members)**

182.   Plaintiffs, for themselves and on behalf of the FLSA Collective Plaintiffs and Class Members repeat, reallege and incorporate by reference the prior allegations of this complaint as if fully alleged herein.

183.   As the result of the foregoing, defendants are guilty of fraud.

184.   Plaintiffs and the Class Members have incurred special damages because defendants' acts have significantly increased the administrative and financial burdens that will be associated with their jobs in the future.  By defendants' violation of the entertainment industry's cardinal rule that the production financing be in place

before beginning a project, Plaintiffs and Class Members will have to educate themselves about how to, and then actually verify the financial soundness of their employers and any guarantors of a production on which they have been offered employment.

185.   As a result of defendants' acts, the reputation, and therefore, the future marketability of Kelman and KZ Video Consultants, Inc. has been damaged.

<u>NINTH CLAIM FOR RELIEF</u>
**Dishonored Checks**
**Brought by KZ Video Consultants**

186.   KZ Video Consultants realleges and incorporates by reference all allegations in all preceding paragraphs.

187.   Newman made out and signed two checks drawn on Stage Presence's account payable to KZ Video Consultants.  The first check was in the amount of $42, 400 and the second check was in the amount of $ 10,000.

188.   Kelman deposited the two checks into KZ Video Consultants' checking account at Citibank.

189.   On or about August 9, 2010, Kelman received notice that the checks had been dishonored and the funds were reversed out of KZ Video Consultants' account. Those checks have been returned to Kelman, unpaid, with the bank's notation thereon "Return Reason (F) Frozen Blocked Account."

190.   As a result of the foregoing, KZ Video Consultants had been damaged in the sum of $52,400 representing the sum of the two dishonored checks, plus $20 in bank fees.

<u>TENTH CLAIM FOR RELIEF</u>
(Corporate Veil Piercing for Joint and Several
Liability of Newman, Weiner and Marquette --
Brought by Plaintiffs for Themselves and on Behalf
of the FLSA Collective Plaintiffs and Class Members)

191.   Plaintiffs, for themselves and on behalf of the FLSA Collective

Plaintiffs and Class Members, repeat, reallege and incorporate by reference the prior

allegations of this complaint as if fully alleged herein.

192.   The Executive Producers misused the corporate form of Stage

Presence and the other corporate entities through which they jointly or individually

conduct business as the means to perpetrate a fraud, deprive employees of wages in

violation of the FLSA and the NYLL and commit other inequitable conduct which

caused harm to Plaintiffs, the FLSA Collective Plaintiffs and Class Members.

193.   The corporate veils of Stage Presence, One From Each Island, Ltd.

and ABC Corp. d/b/a Chung King Filmed Entertainment, should be pierced and

Norman, Weiner and Marquette held jointly and severally liable for the damages

caused to Plaintiffs and the Class Members.


**WHEREFORE,** (1) the named Plaintiffs, individually and on behalf of all other

similarly situated persons, request the Court to grant the following relief:

A.   Designation of this action as a collective action on behalf of the FLSA
Collective Plaintiffs (asserting FLSA claims and state claims) and prompt
issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated
members of the FLSA opt-in class, apprising them of the pendency of this
action, and permitting them to assert timely FLSA claims and state claims
in this action by filing individual Consent to Sue forms pursuant to 29
U.S.C. §216(b);

B.   Designation of Plaintiffs as Representatives of the FLSA Collective
     Plaintiffs;

C.   Designation of this action as a class action pursuant to Fed. R. Civ. P. 23;

D.   Designation of Plaintiffs as Representatives of the Class and counsel of
     record as Class Counsel;

E.   Unpaid wages and liquidated damages of $150,000,000 pursuant to 29
     U.S.C. § 201 et seq. and the supporting United States Department of Labor
     regulations;

F.   Penalties available under applicable laws;

G.   Unpaid regular wages and overtime wages and other unpaid wages of
     $75,000,000 pursuant to N.Y. Lab. Law Art. 6, §§ 190 et seq., Article 19, §§
     650 et seq., and the supporting New York State Department of Labor
     regulations, plus pre-judgment interest;

H.   Prejudgment and post-judgment interest, as provided by law;

I.   An injunction requiring defendants to pay all statutorily-required wages
     pursuant to the New York Labor Law;

J.   Costs of the action, including expert fees;

K.   Attorneys' fees, including fees pursuant to 29 U.S.C. § 216, N.Y. Lab. L. §
     663 and other applicable statutes;

L.   Pierce the corporate veils of Stage Presence, One From Each Island, Ltd.
     and ABC Corp. d/b/a Chung King Filmed Entertainment and hold
     Norman, Weiner and Marquette jointly and severally liable on all the
     claims asserted herein;

M.   On the Sixth Claim for Relief, for breach of contract, judgments for
     Plaintiffs and the Class Members on the amounts owed to them for their
     work labor and services;

N.   On the Seventh Claim for Relief, a declaration that the defendants' acts
     violated the FLSA and the NYLL;

O.    On the Eighth Claim for Relief, for fraud, judgments for Plaintiffs and the Class Members in the amount of their individual damages, as proven at trial;

P.    Such other relief as this Court shall deem just and proper.

(2)    KZ Video Consultants requests the Court to grant the following additional relief:

Q.    On the Ninth Claim for Relief, on the dishonored checks, judgment in the amount of $52,420, plus interest, penalties, costs and attorneys' fees.


Date:  New York, New York
       August 17, 2010


The Law Office of Kerry E. Connolly, Esq.


By:    _Kerry E. Connolly_____
       Kerry E. Connolly (KC 5614)


Attorneys for Plaintiffs, the
FLSA Collective Plaintiffs and the
Class Members

One Battery Park Plaza, 32nd Floor
New York, NY  10004
(212) 372-7333 - telephone
(917) 591-4858 – facsimile
kconnolly@connollylaw.us.com