UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                  :

TINA MAGNUSON, et al., *for themselves and on*    :
    *behalf of those similarly situated,*

                        :

                    Plaintiffs,    :

                        :

        -v-                    :

                        :

ALLEN NEWMAN, et al.,                  :

                        :

                  Defendants.    :

                        :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **09/25/2013**

10 Civ. 6211 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

    Plaintiffs, a group of television production professionals and companies, bring claims pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York State Labor Law ("NYLL"), N.Y. Lab. Law §§ 650 *et seq.*, as well as state law claims for breach of contract and fraud, seeking unpaid wages earned for work performed on a television event produced by Defendants. The parties have cross-moved for summary judgment on some claims. For the reasons discussed below, both motions are granted in part and denied in part.

## BACKGROUND

    Defendants admit almost all of the facts offered by Plaintiffs in their Local Rule 56.1(a) statement. (*See generally* Defs.' Local Rule 56.1(b) Counterstatement (Docket No. 146)). "The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law," however, "and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). Therefore, "allegations of

uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement," and "[w]here . . . the record does not support [some] assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."  *Id.* at 73-74; *see also Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement, [but] must be satisfied that the citation to evidence in the record supports the assertion.").

In this case, the Court has identified several instances where the evidence cited in Plaintiffs' Local Rule 56.1 statement was not filed in support of their motion, does not exist, or does not in fact support the stated facts.  (*See, e.g.*, Pls.' Local Rule 56.1 Statement ¶¶ 38-39 (citing to pages of a deposition transcript not included in Plaintiffs' cross-motion (Docket No. 137)); *id.* ¶ 59 (citing to paragraph twenty-seven of a declaration containing only twenty-five paragraphs and a second declaration that incompletely supports the Local Rule 56.1 statement); *id.* ¶ 69 (citing to deposition testimony offering conflicting statements either weakly supporting or contradicting the facts in Plaintiffs' Local Rule 56.1 Statement)).  Accordingly, the Court has conducted an independent review of the record.

Defendant Allen Newman is the overwhelming majority, if not sole, shareholder in Defendant Stage Presence, Inc., a television production company.  (Testimony of Allen Newman at Attachment Hearing on October 21, 2010 ("Newman Testimony") at 41:19-25 (First Connolly Decl. Ex. 4 (Docket No. 141-6))).  In August 2009, Newman closed Stage Presence's New York office, sublet his apartment, and moved, with his family, to Anguilla.  (*Id.* at 7:8-21; Full Transcript of Attachment Hearing on October 21, 2010 at 14:7-8 ("Full Transcript") (Docket No.

62-2)).  There, he took a job with Anguilla Music Production and Publishing ("AMPP"), in which he was a shareholder, for which he was a member of the board of directors, and from which he received a housing stipend.  (Newman Testimony at 44:14-16, 64:3-6).  In his position with AMPP, Newman intended to "help build the business" through merchandising, management of artists, and music publishing.  (*Id.* at 61:24 to 62:15).  AMPP established a subsidiary production company, One From Each Island, Ltd. ("OFEI"), with Newman as the general manager.  (*Id.* at 46:16 to 47:1; First Newman Dep. (First Connolly Dep. Ex. 5 at 21:4-11 (Docket No. 141-7))).

Newman became interested in putting on a show to benefit Haiti, and partnered with a charity named Childhelp to manage the proceeds.  (*See* Full Transcript at 14:14-23).  Childhelp already had another charity event scheduled to occur in Washington, D.C. (the "Show") prior to the event that Newman intended to produce to benefit Haiti.  (Newman Testimony at 16:6-8).  Newman developed a plan with his longtime associate, Defendant Matthew Weiner, and Weiner's longtime associate, Defendant Gregory Marquette (collectively, the "Producers"), to produce the Show as well as the event to benefit Haiti.  (Full Transcript at 17:17 to 18:6; First Connolly Decl. Ex. 12).  At the time that the Producers became involved in the Show, they and the charity expected several significant political figures, including Bill Clinton and Michelle Obama to participate, which would have helped them secure sponsors to cover the costs.  (Full Transcript at 17:20-21).  Ultimately, neither Bill Clinton nor Michelle Obama participated in the Show, and the Producers and charity were unable to secure other high-profile figures.  (*Id.* at 17:20-21, 18:11-13).

Defendants contend that in light of the failure to secure high-profile figures to headline the event, they advised Childhelp to cancel the show, but that Childhelp refused to do so.  (Full Transcript at 19:8-12).  Instead, Childhelp arranged an introduction to Geneve International Trust

("Geneve"), which ultimately agreed to provide financing for the Show.  (First Connolly Decl. Ex. 14 ¶ 15; First Connolly Decl. Ex. 15).  Although there are significant and extensive disputes about the specific business relationships involved in this series of transactions, it is uncontested that Newman, Weiner, and Marquette, through a corporate entity that one or more of them controlled, agreed to produce the two events.  (First Connolly Decl. Exs. 12-16 (Docket Nos. 141-14 to 141-18)).  Geneve signed a Production Loan Agreement in which it agreed to provide a $5 million loan to fund the two planned events.  (*See* First Connolly Decl. Ex. 14-15).[1]  In order to get television time for the Show, Newman and Weiner met with BET/Centric ("BET") and agreed to pay BET to run the Show on its cable channel.  (First Connolly Decl. Ex. 16).

Newman hired Plaintiff Allen Kelman to be the producer of the Show and directed the hiring of the rest of the production crew (the "Crew"), many of whom are Plaintiffs in this action.  (First Newman Dep. at 53:22 to 57:10).  Kelman claims that Newman told him that Stage Presence would be the production company for the Show and that Newman never told him that the planned funding for the Show was in the form of a loan from Geneve to AMPP.  (Testimony of Allen Kelman at Attachment Hearing on October 13, 2010 at 22:22 to 23:18 (First Connolly Decl. Ex. 3 (Docket No. 141-5)).  Despite the fact that the funding from Geneve never materialized, planning and pre-production for the Show continued, and the Show eventually took place on April 13, 2010.  (*See* Newman Testimony at 16:6-8; First Connolly Decl. Ex. 30 (Docket No. 141-31)).  Plaintiffs served in various positions on the Crew for the Show.  (First Newman Dep. at 56:15-19).

Stage Presence's practice was to hire a pay master, or payroll processor, to administer payroll; for the Show, Stage Presence hired Media Services to perform this function.  (*Id.* at

---

[1]     As discussed below, there are two versions of this agreement.

118:11-22).  Newman was able to avoid making a cash deposit that Media Services customarily

requires for each production because he left funds in Stage Presence's account from the

television special he had worked on immediately prior to the Show.  (Magnuson Decl. ¶ 14

(Wims Decl. Ex. 7 (Docket No. 134-7))).  That money remained in Stage Presence's account

because it had failed to pay all of the vendors on the prior production.  (*Id.*).  After the Show,

when the lower level producers attempted to release the payroll funds to the Crew, Media

Services informed them that there were insufficient funds in Stage Presence's account.  (*Id.*

¶ 17).  Media Services subsequently resigned from its position with Stage Presence.  (*Id.*).  The

Producers do not contest that Stage Presence owes the Plaintiffs their claimed wages for their

work on the Show.  (Newman Testimony at 35:7-21).

Plaintiffs filed this lawsuit on August 18, 2010 seeking payment of overtime and

minimum wages under the FLSA and NYLL, as well as damages for state law breach of contract

and fraud claims.  (Docket No. 1).  Plaintiffs sought to hold the Producers individually liable for

their claims.  (*Id.*).  Plaintiffs moved for summary judgment prior to discovery.  (Docket No. 51).

After a hearing at which Defendants did not contest that Stage Presence owed Plaintiffs the

claimed wages, Judge Holwell granted the Plaintiffs' motion for summary judgment on their

breach of contract claim against Stage Presence, but denied the remainder of their motion against

all Defendants because there were disputes of material fact.  (Docket Nos. 91, 128).

Following the entry of judgment consistent with this ruling on December 1, 2011, Stage

Presence filed for bankruptcy on February 9, 2012.  (Docket No. 105; Stage Presence

Bankruptcy Filing (First Connolly Decl. Ex. 17 (Docket No. 141-19))).  During the bankruptcy

proceedings, as Stage Presence attempted to bring an adversary proceeding against Geneve, it

produced for the first time a version of the Production Loan Agreement to which it was the

signatory, apparently signed on the same date as the agreement between AMPP and Geneve. (First Amended Complaint (First Connolly Decl. Ex. 15).

Plaintiffs filed an Amended Complaint joining proper parties on October 11, 2011. (Docket No. 103).  After an extended period of discovery, during much of which both sides did little or nothing and repeatedly failed to raise long-pending discovery disputes with the court (Docket Nos. 112-17), the parties filed cross Motions for Summary Judgment.  (Docket Nos. 131, 142).  Defendants seek the dismissal of all Plaintiffs' claims except for the breach of contract action against Stage Presence, on which judgment was already granted, and a related claim for amounts owed on checks issued by Stage Presence on which Newman later stopped payment.  (Defs.' Mem. 5 (Docket No. 135).  Plaintiffs seek summary judgment on their FLSA and NYLL claims, to hold the Producers personally liable on their breach of contract claim, and to hold Newman liable under New York Business Corporations Law, a claim that they did not raise in their Amended Complaint.  (*See generally* Pls.' Mem. (Docket No. 143)).

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of

proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment

must be based on personal knowledge, must "set forth such facts as would be admissible in

evidence," and must show "that the affiant is competent to testify to the matters stated therein."

*Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).[2]

## DISCUSSION

As noted, Plaintiffs bring claims under the NYLL, the FLSA, and New York state

common law.  One side or the other moves for summary judgment with respect to each set of

claims. In addition, Plaintiffs ask the Court to impose sanctions for alleged discovery violations.

The Court will address the summary judgment arguments first, then the discovery issue.

## A.  The NYLL Claims

As an initial matter, Plaintiffs bring claims under the NYLL for minimum wage,

overtime, and spread of hours violations.  (Amended Compl. ¶¶ 156-167).  Defendants contend

that the NYLL does not apply in this action because Plaintiffs' work on the Show did not occur

in New York.  (Defs.' Mem. 8-9).  Plaintiffs do not dispute the fact that their work took place

outside of New York.  Instead, noting that Stage Presence was incorporated in New York, they

argue that the Court should apply the NYLL, either because of the "internal affairs doctrine"

(according to which, Plaintiffs assert, the law of the state in which a company incorporates

governs its internal affairs) or "conflicts of law interests analysis."  (Pls.' Mem. 19-20).

Under New York law, it is a "settled rule of statutory interpretation, that unless expressly

stated otherwise, 'no legislation is presumed to be intended to operate outside the territorial

jurisdiction of the state . . . enacting it.'"  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 730 N.Y.S.2d 46,

47 (App. Div. 1st Dep't 2001) (quoting 73 Am. Jur. 2d Statutes § 359, at 492), *aff'd*, 98 N.Y.2d

---

[2]     Although Rule 56 of the Federal Rules of Civil Procedure was amended and reorganized
in 2010, the advisory committee notes indicate that "[t]he standard for granting summary
judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note.

314 (2002); *see also* N.Y. Stat. Law § 149 (McKinney) ("The laws of one state can have no force and effect in the territorial limits of another jurisdiction, in the absence of the consent of the latter.").  Article 19 of the NYLL, which includes the minimum wage, overtime, and spread of hours provisions relevant to this case, begins with a "Statement of Public Policy" section stating that it was enacted to address the fact that "[t]here are persons employed in some occupations *in the state of New York* at wages insufficient to provide adequate maintenance for themselves and their families."  N.Y. Lab. Law § 650 (McKinney) (emphasis added).  In combination with the presumption against extraterritoriality, it follows that the statute does not apply to people who work outside of the State of New York.  *See also Kassman v. KPMG LLP*, 925 F. Supp. 2d. 453, 469 (S.D.N.Y. 2013) (holding that the antidiscrimination provisions of the NYLL do not apply extraterritorially and citing cases).  Accordingly, Plaintiffs' claims under the NYLL fail as a matter of law.

   In the alternative, Plaintiffs seek leave to amend the Amended Complaint to bring claims under the analogous provisions of another jurisdiction, presumably the District of Columbia. (Pls.' Mem. 20 n. 7).  The deadline for amendment of the pleadings, however, expired on July 5, 2012 (*see* Docket No. 111), and Plaintiffs have not shown "good cause" for their failure to seek leave prior to the deadline.  *See* Fed. R. Civ. P. 16(b)(4).  Indeed, Plaintiffs were aware that the extraterritoriality of the NYLL was an issue no later than April 20, 2011, when Defendants first moved for summary judgment on this ground.  (*See* Defs.' Mem. Law Opp. Pls.' Mot. Summ. J. 8 (Docket No. 81) (contesting application of the NYLL to this case)).  Moreover, Plaintiffs subsequently sought, and were granted, leave to amend their complaint, but failed to address this potential deficiency by bringing claims under the relevant labor laws of other jurisdictions, either in addition to, or in lieu of, their NYLL claims.  (*See* Pls.' Mot. Am. Compl. (Docket No. 100)

9

(seeking leave to amend the complaint following disposition of Defendants' prior motion)).

Finally, this case has been pending for over three years already and is now ready for trial;

allowing amendment at this late stage would cause further delay.  For these reasons, Plaintiffs

are unable to demonstrate good cause, and their request for leave to amend is denied.

## B.  The FLSA Claims

Next, Plaintiffs bring claims for minimum wage and overtime claims under the FLSA.

Congress enacted the FLSA "with the goal of protecting all covered workers from substandard

wages and oppressive working hours."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct.

2156, 2162 (2012) (internal quotation marks omitted); *see also* 29 U.S.C. § 202(a).  Among other

things, the Act obligates "employers" to pay non-exempt "employees" a minimum wage and for

all hours in excess of forty per week at a rate of one and half times the employees' regular

wages.  *See* 29 U.S.C. § 207(a)(1).  The questions here are (1) whether Plaintiffs were

"employees"; (2) if so, whether the individual Defendants were their "employers"; and (3) if so,

whether Plaintiffs were nonetheless exempt as either creative professionals or executive

employees.  The Court will address each in turn.

### 1.  Plaintiffs' Employment Status

First, the FLSA provides protection to "employees" but not to independent contractors.

29 U.S.C. § 203(r)(1).  Unsurprisingly, therefore, Plaintiffs contend that they were hired as

"employees," while Defendants argue that Plaintiffs were "independent contractors," and each

side moves for summary judgment on these grounds.  (*Compare* Pls.' Mem. 11-18, *with* Defs.'

Mem. 8-15).[3]  The FLSA contains no definition of "independent contractor."  Only slightly less

---

[3]      Defendants also seek to dismiss any FLSA claims brought by the corporate Plaintiffs, on
the ground that the FLSA protects only natural persons.  (Defs.' Mem. 8, 15 n.3).  It is not clear
from the Amended Complaint whether the corporate Plaintiffs assert claims under the FLSA.  In
any event, Plaintiffs fail to respond to Defendants' argument on this score.  Accordingly, to the

helpful, the statute circularly defines both employer, *see* 29 U.S.C. § 203(d) ("any person acting directly or indirectly in the interest of an employer in relation to an employee"), and employee, *see id.* § 203(e)(1) ("any individual employed by an employer"), while broadly defining "employ" to mean "to suffer or permit to work," *id.* § 203(g); *see Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) ("Unfortunately, . . . the statute's definition of 'employer' relies on the very word it seeks to define . . . .  The statute nowhere defines 'employer' in the first instance."); *see also DeJesus v. HF Mgmt. Servs., LLC*, — F.3d —, 2013 WL 3970049, at *5 (2d Cir. Aug. 5, 2013).

The Second Circuit and Supreme Court have recognized "that the 'striking breadth' of the FLSA's definition of 'employ' 'stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles,' in order to effectuate the remedial purposes of the act." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).  Accordingly, these courts have "instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity.'" *Id.* (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961), and *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), respectively); *accord DeJesus*, 2013 WL 3970049, at *5.

Applying these standards, the Court of Appeals "'has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality

---

extent that the Amended Complaint does include FLSA claims on behalf of the corporate Plaintiffs, the Court deems those claims abandoned.  *See, e.g.*, *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 445 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

of the circumstances'" and has "'identified different sets of relevant factors based on the factual challenges posed by particular cases.'"  *Irizarry*, 722 F.3d at 104 (quoting *Barfield*, 537 F.3d at 141-42).  Most relevant here is *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988), in which the Second Circuit established the factors "relevant in determining whether individuals are 'employees' or independent contractors."  These factors include:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Id.* at 1058-59.  The Court was clear, however, that "[n]o one of these factors is dispositive," that "the test is based on a totality of the circumstances," and that "[t]he ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."  *Id.* at 1059.  "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts — whether workers are employees or independent contractors — is a question of law."  *Id.*

In light of these standards, summary judgment must be denied, as neither Defendants nor Plaintiffs have met their burden of demonstrating that they are entitled to judgment as a matter of law.  As an initial matter, the motion papers and evidence make clear that Plaintiffs performed a variety of jobs, with significantly different responsibilities and for varying periods of time during the production of the Show.  Accordingly, it is plain that application of the economic realities test will vary by Plaintiff — for example, a security guard might be less integral to the production company's business than a line producer, or a production coordinator's skills and independent initiative might differ from those of a camera operator.  For the most part, however, the parties lump Plaintiffs together and fail to differentiate among them.  That is, instead of

marshalling evidence concerning Plaintiffs individually (or, alternatively, demonstrating why the Plaintiffs should be considered together), each side effectively cherry-picks the Plaintiffs and facts most favorable to its side of the argument on each factor.  It follows that neither side has shown that it is entitled to judgment as a matter of law.

Moreover, even assuming that Plaintiffs could be treated uniformly, summary judgment would still be denied on this point because there are genuine disputes as to material facts.  For example, the parties vigorously dispute the degree of skill and independent initiative required for Plaintiffs' work on the Show.  Defendants argue that Plaintiffs are skilled professionals exercising a significant amount of discretion and initiative to perform their jobs, (*see* Defs.' Mem. 13-14), an argument that is supported by several Plaintiffs' testimony that they retained significant control over how they performed their jobs.  In particular, these Plaintiffs testified that the Producers and Director provided only a vision of the production and then relied upon Plaintiffs' skill and experience to deliver it (*see, e.g.* Del Russo Dep. 32:9-14 (First Connolly Decl. Ex. 21 (Docket No. 141-22)); Kulick Decl. ¶ 5 (Wims Decl. Ex. 10 (Docket No. 134-10)). On the other hand, some Plaintiffs, including some Plaintiffs who testified as to the Producers' reliance on their skill, also indicated that they received specific direction — including, for example, direction with respect to specific shots to capture.  (*See, e.g.*, Del Russo Dep. 32:1-6, 15-23).  Further, the vast majority of Plaintiffs were classified by Stage Presence as employees for tax purposes (Pls.' Mem. 14), a factor that is "significant" (albeit not dispositive) in the analysis.  *Brock*, 840 F.2d at 1059.  Summary judgment is inappropriate where such disputes of fact exist.

### 2.  The Individual Defendants' Liability as Employers

As noted, the corporate entity that hired Plaintiffs, Stage Presence, has entered

bankruptcy, and thus all proceedings against it are stayed pursuant to Title 11, United States

Code, Section 362.  (Stage Presence Bankruptcy Filing (First Connolly Decl. Ex. 17)).  Unable to

pursue their claims against Stage Presence, Plaintiffs seek to hold Newman, Weiner, and

Marquette individually liable for their FLSA claims — Newman as their "employer" within the

meaning of the FLSA and Weiner and Marquette as Newman's partners or agents.  (*See* Pls.'

Mem. 11).  Plaintiffs move for summary judgment on this score.  (Pls.' Mem. 11, 24-28).

It is well established that, in certain circumstances, a corporate executive or officer may

be held individually liable as an "employer" under the FLSA, as "[t]he Supreme Court has

emphasized the 'expansiveness' of the FLSA's definition of employer."  *Herman v. RSR Sec.*

*Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (citing *Falk v. Brennan,* 414 U.S. 190, 195 (1973)).

As the Second Circuit recently summarized, four factors — derived from *Carter v. Dutchess*

*Community College*, 735 F.2d 8 (2d Cir. 1984) — are relevant to the inquiry:

> whether the alleged employer (1) had the power to hire and fire the employees,
> (2) supervised and controlled employee work schedules or conditions of
> employment, (3) determined the rate and method of payment, and (4) maintained
> employment records.

*Irizarry*, 722 F.3d at 104-05 (internal quotation marks omitted).  These four factors are not

exhaustive, however, as there are others that "bear[] upon the 'overarching concern [of] whether

the alleged employer possessed the power to control the workers in question.'"  *Irizarry*, 722

F.3d at 105 (quoting *RSR*, 172 F.3d at 139) (second alteration in original).

In *Irizarry*, the Court examined these other factors by reference to two relevant "legal

questions":

> The first concerns the scope of an individual's authority or "operational control"
> over a company — at what level of a corporate hierarchy, and in what relationship
> with plaintiff employees, must an individual possess power in order to be covered
> by the FLSA?  The second inquiry, related but distinct, concerns hypothetical
> versus actual power: to what extent and with what frequency must an individual

14

> actually use the power he or she possesses over employees to be considered an employer?

*Id.* at 106.  In addressing these questions, the Court made clear that "[e]vidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." *Id.* at 109.  Instead, such an individual "must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Id.*  The ultimate question is whether there is evidence of "authority over management, supervision, and oversight of [the company's] affairs in general, as well as evidence under the *Carter* framework or any other factors that reflect [the individual's] exercise of direct control over the plaintiff employees?" *Irizarry*, 722 F.3d at 111 (internal quotation marks and citation omitted).

In light of these principles, there is little question that Newman qualifies as an employer under the FLSA.  Newman admitted that he had the power to hire and fire members of the Crew, satisfying the first *Carter* factor.  (First Newman Dep. at 82:24-83:5).  He also testified that, as the director of the Show, he was on site to control the production and had the authority to tell the Crew what to do, to control the conditions of employment (such as the rehearsal space used), and to set the schedule, thereby satisfying the second *Carter* factor.  (*See* Newman Testimony at 72:13-73:4; First Newman Dep. at 55:11-14, 57:21-58:5, 58:6-15, 62:5-14, 82:24-83:5).  Further, although Newman testified that he was not involved in determining the rate of payment, he was undeniably involved in determining the method of payment, as he signed Plaintiffs' paychecks (*see* Newman Testimony at 37:1-14; First Connolly Decl. Ex. 23 (Docket No. 141-24)), which supports a finding in favor of Plaintiffs on the third *Carter* factor.  *See RSR*, 172 F.3d at 140 ("The key question is whether [the corporate officer] had the authority to sign paychecks.").  Finally, although Newman was not personally and directly involved in maintaining employment

15

records, he regularly ordered that his workers hire Media Services, a payroll services company, to maintain employment records on jobs that he produced, including the Show, which satisfies the fourth *Carter* factor.  (First Newman Dep. at 118:11-22).

In addition, the record makes clear that Newman had — and exercised — "operational control" over Plaintiffs.  *Irizarry*, 722 F.3d at 110-11; *see also RSR*, 172 F.3d at 140-41.  Among other things, he was the sole shareholder and only employee of Stage Presence; he controlled the company's finances; and he directly supervised two Plaintiffs, Kelman and Magnuson, who in turn had day-to-day responsibility for overseeing the other Plaintiffs.  (Newman Testimony at 41:19-25 (sole shareholder and only employee); *id.* at 37:19-22 (controlled finances as evidenced by control over bank account); First Newman Dep. at 56:15 to 57:20 (supervised Kelman and Magnuson)).  The fact that Newman delegated supervision over some operations to Kelman and Magnuson (Newman Testimony at 30:9-13), does not preclude a finding that he retained "operational control," as employer "status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees."  *RSR*, 172 F.3d at 139.  In fact, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence."  *Id.* (internal quotation marks and alteration omitted).  In short, if Plaintiffs are found at trial to be "employees" within the scope of the FLSA, Newman qualifies as their "employer."

Whether Marquette and Weiner can also be held individually liable under the FLSA, on the other hand, is not a question that can be answered on the present record.  First, an employer's business partner is not subject to liability under the FLSA based upon state partnership and agency law, as Plaintiffs contend (Pls.' Mem. 11, 27-28), but rather only if he qualifies as an

employer in his own right or as a "joint employer" under the economic reality test.  *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 70-71 (2d Cir. 2003).  As Plaintiffs have failed to make any argument or to marshal the evidence to demonstrate that they are entitled to judgment as a matter of law under the relevant standard, their motion for summary judgment is denied.  At the same time, there is evidence of Marquette and Weiner's control, which creates a genuine issue of material fact as to their independent status as employers.  For example, Newman testified that, as producers, Marquette and Weiner had the power to hire and fire employees and change the production schedule (*see* First Newman Dep. at 62:5-14, 82:24-83:5), and Weiner testified that the three of them "operated under the umbrella" of OFEI and Stage Presence (First Weiner Dep. at 9:2-13 (First Connolly Decl. Ex. 9 (Docket No. 141-11))).  Accordingly, the question of whether Marquette and Weiner also qualify as Plaintiffs' employers must be left for trial.

### 3.  FLSA Exemptions

Finally, Defendants argue in the alternative that Plaintiffs are exempt from coverage by the FLSA as either creative professionals or executive employees.  (Defs.' Mem. 15-19).  "Because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed . . . .  Accordingly, an employer bears the burden of proving that its employees fall within an exempted category of the Act."  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks and alteration omitted).   Application of the statute's exemptions "is a mixed question of law and fact."  *Id*. (internal quotation marks omitted).  Specifically, "'[t]he question of how the [employees] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . .'"  *Id.* (alterations in original) (quoting *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986)).  "Determining whether an employee is

exempt from the overtime requirements is a highly fact-intensive inquiry that is to be made on a case-by-case basis in light of the totality of the circumstances." *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361 (PGG), 2010 WL 1327242, at *5 (S.D.N.Y. Mar. 31, 2010) (internal quotation marks omitted). As a result, "[m]any courts have held that resolving this difficult and intensive factual inquiry is inappropriate at summary judgment." *Id.* at *6 (citing cases).

Defendants argue first that all Plaintiffs are exempt as "creative professionals." (Defs.' Mem. 15-17).[4] That exemption extends to any employee "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week," whose work requires "invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300; *see also id.* § 541.302. To be paid on a fee basis, an employee must be "paid an agreed sum for a single job regardless of the time required for its completion." *Id.* § 541.605. To be paid on a salary basis, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." *Id.* § 541.602(a). Finally, to satisfy the "creative" component of the exception, an employee's "primary duty must be the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor, . . . includ[ing] such fields as music, writing, acting and the graphic arts," rather than "routine mental, manual, mechanical or physical work. *Id.* § 541.302(a), (b). "Primary duty," in turn, "means the principal, main, major or most important duty that the employee performs," a determination that "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* § 541.700(a); *see id.* (identifying "[f]actors to consider when determining the primary duty of an employee").

---

[4]    Defendants use the term "artistic professional" rather than "creative professional" (Defs.' Mem 17), but the substance of their argument is that Plaintiffs fall under the FLSA exemption for "creative professionals."

Defendants have not addressed the salary or fee basis component of the regulations at all in their papers, which is a sufficient basis in itself to deny their motion.  Moreover, Plaintiffs have submitted evidence that, with the exception of Sumner and Magnuson, all Plaintiffs were paid by the day or by the hour, and thus fail to satisfy salary or fee basis requirement.  (*See* Pls.' Payroll Time Cards (First Connolly Decl. Ex. 1 (Docket Nos. 141-1 to 141-3))).  As for Sumner and Magnuson, Defendants have failed to argue, let alone establish, that their jobs were creative within the meaning of the regulations.  (*See* Defs.' Mem. 17).  In fact, the evidence in the record concerning their roles suggests that they performed non-creative jobs.  Sumner was the production coordinator for the Show, a role that Newman described as responsible for assisting the production manager and coordinating logistics and conceded was "not . . . creative."  (First Newman Dep. at 71:7-19 and 72:7).  Magnuson, on the other hand, was the line producer and had similarly non-creative tasks, including managing budget, hiring crew, booking all travel, and getting permits.  (First Connolly Decl. Ex 22 at 31:11-16, 43:11-25).  Accordingly, Defendants' motion for summary judgment as to the creative professional exemption is denied.

Additionally, Defendants argue that Magnuson is exempt as an executive employee.[5] The regulations define "employee employed in a bona fide executive capacity" to mean any employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

---

[5]   Defendants argue that Kelman also falls within the executive exemption, but Kelman withdrew his claims under the FLSA on February 7, 2011.  (Kelman Decl. Supp. Prior Mot. Summ. J. ¶ 12 (Docket. No. 63)).  Accordingly, Defendants' argument on that point is moot.

> (4) Who has the authority to hire or fire other employees or whose suggestions
> and recommendations as to the hiring, firing, advancement, promotion or any
> other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  Once again, however, Defendants fail to address Magnuson's pay basis

at all.  In fact, Defendants' entire argument consists of two sentences to the effect that "Plaintiff

Magnuson supervised the crew" and "Magnuson . . . hired and had the power to fire the crew."

(Defs.' Mem. 19).  This cursory showing is insufficient to carry Defendants' burden on summary

judgment, especially in light of the narrow construction of the FLSA exemptions and the fact-

intensive nature of the inquiry.  *See Indergit*, 2010 WL 1327242, at *5-6 (declining to rely

strictly on deposition testimony and denying summary judgment where the record did not

provide a full picture of the plaintiffs' duties).  Magnuson's role may well meet the definition of

"management" in the regulations, see 29 C.F.R. § 541.102, but Defendants have failed to

demonstrate that the management aspects of her job were her "primary dut[ies]," which is

required for summary judgment in their favor, *see id.* § 541.100(a)(2).  Accordingly,

Defendants' motion for summary judgment on these grounds is denied.

## C.  Plaintiffs' Other State Law Claims

Finally, Defendants move for summary judgment with respect to Plaintiffs' fraud claims

and claims to pierce the corporate veil against Newman, Weiner, and Marquette.  (Defs.' Mem.

19-21).  For their part, Plaintiffs move for summary judgment on their alter ego claims — but not

on their fraud claims — and on a claim that Newman is personally liable under New York

Business Corporations Law Section 630.  (Pls.' Mem. 24-29).

First, Defendants contend that Plaintiffs' fraud claims must be dismissed because, when

"allegations of fraud are combined with contract claims there is no claim for relief when the only

fraud relates to the breach of contract."  (Defs.' Mem. 19).  It is true that "[g]eneral allegations

that a defendant entered into a contract with the intent not to perform are insufficient to support a fraud claim." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 233 (App. Div. 1st Dep't 2011).  At the same time, "[a] fraud claim will be upheld when a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, even though the same circumstances also give rise to the plaintiff's breach of contract claim." *Id.*  That is the case because, "[u]nlike a misrepresentation of future intent to perform," which forms the basis of a breach of contract claim, "a misrepresentation of present facts is collateral to the contract and therefore involves a separate breach of duty."  *Id.* (internal quotation marks and alteration omitted).  Here, Plaintiffs' have alleged that Newman, in conjunction with Weiner and Marquette, misrepresented to Kelman that funding had been secured to induce him and the rest of the Crew to work on the Show.  (Kelman Decl. ¶¶ 18-21 (Docket No. 139)).  Accordingly, they have stated a claim for fraud separate and apart from their breach of contract claim. Moreover, as Newman disputes the claim that he failed to tell Kelman about the status of funding for the Show, there are disputes of material fact that preclude summary judgment.  (*Compare* Kelman Decl. ¶¶ 8, 18-19, 21, *with* Newman Decl.  ¶¶ 55-60 (Wims Decl. Ex. 1 (Docket No. 134-1)).  Thus, Defendants' motion for summary judgment dismissing the fraud claims in their entirety as duplicative of the breach of contract claims is denied.

Next, Defendants move for summary judgment with respect to Plaintiffs' contract claim against Newman, Weiner, and Marquette, contending that they were not parties to the contract and that there is no basis to pierce the corporate veil to hold them individually liable.  (Defs.' Mem. 19-21).  Plaintiffs cross-move for summary judgment on this claim, and as the party seeking to pierce the veil, have the "burden to show that the individual defendants abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against

them." *James v. Loran Realty V Corp.*, 20 N.Y.3d 918, 919 (2012) (internal quotation marks

omitted).  Piercing the corporate veil "requires a showing that: (1) the owners exercised complete

domination of the corporation in respect to the transaction attacked; and (2) that such domination

was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."

*Morris v. N.Y.S. Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993).

　　　There are material disputes of fact that preclude summary judgment for either side.  On

the one hand, Plaintiffs contend that Newman, in conjunction with Weiner and Marquette,

misused the corporate form of Stage Presence to incur the costs of the production of the Show on

behalf of Stage Presence, while reserving to their other corporations, OFEI and AMPP, or to

themselves, the benefits of the Show, namely ownership of the final tape.  (Pls.' Mem. 25-27).

On the other hand, Defendants assert that the corporate relationships were contractual and

proper, that the Stage Presence corporate form was not misused or abused, and that ownership of

the final production rests not with OFEI or AMPP, but with BET and Childhelp.  (Newman Decl.

¶¶ 110-114).  Plaintiffs' contention is supported by evidence that the copyright is held by OFEI

and that Newman and Marquette have been attempting to sell the tape (First Newman Dep. at

87:3-88:23; Kelman Decl. ¶ 22), as well as by Marquette's inability to provide a clear answer as

to which entity he was representing in his efforts to sell the tape (First Marquette Decl. at 57:1-

10 (First Connolly Decl. Ex. 7 (Docket No. 141-9))).  Moreover, the various contracts for

financing and production (including the two different versions of the Production Loan

Agreement) were signed by multiple corporate entities, only one of which had a relationship with

the Crew.  (First Connolly Decl. Exs. 13-16).  As the management and contractual relationships

between and among Defendants and ownership of the tape of the Show are all in dispute,

summary judgment cannot be granted on this issue.

Finally, in their motion papers, Plaintiffs attempt to allege a claim under New York

Business Corporation Law Section 630.  (Pls.' Mem. 28).  Plaintiffs failed to include any claim

under this statute in their Amended Complaint, however, and therefore may not raise it for the

first time in their motion papers.  *See, e.g.*, *Ifill v. New York State Court Officers Ass'n*, 655 F.

Supp. 2d 382, 393 (S.D.N.Y. 2009) ("[A party] may not amend his complaint to add new claims

by raising them for the first time in his motion papers.").  Defendant's application to dismiss this

claim, to the extent such a claim even exists, is thus granted.

## D.  The Motion for Discovery Sanctions

As noted, Plaintiffs also seek discovery sanctions against the individual Defendants based

upon their alleged failure to preserve and produce e-mails and documents relevant to the case.

(Pls.' Mem. 22-24).  As a remedy, Plaintiffs ask the Court to strike Defendants' answer —

tantamount to granting summary judgment in Plaintiffs' favor — or, in the alternative, issue an

adverse inference instruction to the jury at trial.  (Pls.' Mem. 24).  Defendants do not respond

substantively to Plaintiffs on this point in their summary judgment opposition brief, but rather

incorporate by reference arguments made in an earlier memorandum of law.  (*See* Defs.' Reply

Mem. 5 (Docket No. 149) (incorporating arguments from Defs.' Mem. Law Opp'n Mot.

Sanctions (Docket No. 123))).  In that earlier memorandum and in discovery-related depositions,

Defendants contended that they had conducted extensive searches and had produced every

responsive document in their possession.  (Defs.' Mem. Law Opp'n Mot. Sanctions 3-4; *see also,*

*e.g.*, Second Newman Dep. at 18:22-23, 28:16 (First Connolly Decl. Ex. 6 (Docket No. 141-8));

Second Marquette Dep. at 9:4-9 (First Connolly Decl. Ex. 8 (Docket No. 141-10)); Second

Weiner Dep. at 20:3-4, 29:6-8 (First Connolly Decl. Ex. 10 (Docket No. 141-12))).

It is well established that a court may impose sanctions for the spoliation of evidence,

defined as "the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007) (internal quotation marks omitted); *see, e.g.*, *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). To justify the imposition of sanctions, however, the moving party must establish by a preponderance of the evidence "'(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)), *cert. denied*, 133 S. Ct. 1724 (2013); *see also, e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 496 (S.D.N.Y. 2010).

Here, there is little question that Defendants' disclosures have not included documents that were once in their possession that would be relevant to the case, as they have failed to produce *any* emails between and among themselves and *any* drafts of contracts relating to the issues of this lawsuit. (Second Connolly Decl. ¶ 4 (Docket No. 144)). As troubling as that omission is, Plaintiffs have failed to carry their burden of establishing that spoliation sanctions are warranted for the simple reason that they have failed to establish that Defendants had an obligation to preserve the evidence at the time it was destroyed. Plaintiffs assert that Defendants were on notice of the possibility of litigation as early as May 2010 (Pls.' Mem. 9; *see also* Second Newman Dep. at 5:14-24; Second Weiner Dep. at 32:14-21), but they have failed to offer any concrete evidence that Defendants were on notice to support that assertion. Accordingly, on

the present record, the earliest Defendants can be said to have been on notice of an obligation to preserve evidence is August 18, 2010, when Plaintiffs filed the original Complaint. *See, e.g.*, *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

Further, Plaintiffs largely fail to establish, or even make any argument concerning, the timing and means of destruction of the evidence (other than a hard drive belonging to Newman), a failure that is especially notable in view of the three-month standard e-mail retention policy of at least one individual Defendant. (*See* Second Marquette Dep. at 37:2-5). Plaintiffs seem to view such information as unnecessary because they contend that Defendants' admitted failure to back up their computers or put a litigation hold in place constitutes *per se* gross negligence. (*See* Pls.' Mem. 23-24 (citing *Pension Comm. of the Univ. of Montreal Pension Plan*, 684 F. Supp. 2d 456)). Plaintiffs cite no authority to support the proposition that Defendants were required to back up their computers, however. Moreover, last year, the Second Circuit abrogated the holding of *Pension Committee of the University of Montreal Pension Plan*, thereby rejecting the argument that the "failure to institute a 'litigation hold' constitutes gross negligence *per se*." *Chin*, 685 F.3d at 162 (internal quotation marks). The Court of Appeals held instead that "the failure to adopt good preservation practices [is] one factor in the determination of whether discovery sanctions should issue." *Id.* (alterations omitted).

In short, although the Court is troubled by Defendants' approach to discovery, Plaintiffs' application for sanctions founders on the first element. Nevertheless, Defendants are hereby advised that in the event they uncover any additional e-mails and documents relevant to this case, this Court is likely to preclude such evidence from being offered at trial. *See Ritchie Risk-Linked*

*Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012) (laying out factors courts consider in determining whether preclusion of evidence is an appropriate sanction).

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' NYLL claims and claims under New York Business Corporations Law Section 630 (to the extent they even exist) and DENIED in all other respects.  Plaintiffs' cross-motion for summary judgment is GRANTED with respect to their claim that Newman qualifies as an "employer" within the meaning of the FLSA and DENIED in all other respects.  Further, Plaintiffs' request for discovery sanctions is DENIED.

The parties are reminded that their Joint Pretrial Order and all related filings required by the Court's Individual Rules and Practices for Civil Cases must be submitted within thirty days and that they should be prepared to go to trial approximately two weeks thereafter.  (Docket No. 115).  The parties shall immediately advise the Court by joint letter if they are interested in a new referral to the assigned Magistrate Judge for purposes of settlement.

**The Clerk of Court is directed to terminate Docket Nos. 131 and 142.**

SO ORDERED.

Dated:  September 25, 2013
        New York, New York

JESSE M. FURMAN
United States District Judge